## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **TIMOTHY S. CARRARA,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | |
| ) | |
| ) | |
| **DR. KILOLO KIJAKAZI,** ) | **Civil Action No. 21-cv-10239-DJC** |
| **ACTING COMMISSIONER OF** ) | |
| **SOCIAL SECURITY ADMINISTRATION,** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |
| ) | |
| ) | |

## MEMORANDUM AND ORDER

**CASPER, J.**                                                    **September 8, 2022**

### I.      Introduction

Plaintiff Timothy S. Carrara ("Carrara") filed a claim for disability insurance benefits ("SSDI") with the Social Security Administration ("SSA").  Pursuant to the procedures set forth in the Social Security Act, 42 U.S.C §§ 405(g), 1383(c)(3), Carrara brings this action for judicial review of the final decision of Defendant Dr. Kilolo Kijakazi, Acting Commissioner[1] of the SSA ("the Commissioner"), issued by Administrative Law Judge Daniel J. Driscoll ("the ALJ") on April 28, 2020, denying Carrara's claim.  D. 1.  Before the Court are Carrara's motion to reverse the decision of the Commissioner, D. 22, and the Commissioner's motion to affirm that decision, D. 27.  Carrara argues that the Appeals Council ("the AC") erred in declining to accept the

---

[1] Pursuant to Fed. R. Civ. P. 25(d), the Court substituted Dr. Kilolo Kijakazi for the previous Acting Commissioner, Andrew M. Saul, as Defendant in this suit.

additional rheumatology records into evidence showing the diagnosis and treatment of fibromyalgia and in declining to review the ALJ's decision. D. 22 at 3–7. Carrara argues that the ALJ also erred in denying his claim: (1) by not considering Carrara's need for additional bathroom breaks due to gastrological impairments; (2) by improperly considering Carrara's obesity; and (3) by not considering the effect of Carrara's combined impairments. Id. at 7–12. For the reasons stated below, the Court ALLOWS the Commissioner's motion to affirm and DENIES Carrara's motion to reverse and remand.

## II.      Factual Background

Carrara was thirty-one years old when he stopped working on December 1, 2018. D. 19[2] at 53. Carrara previously worked as "a [c]all center representative, . . . [r]etail clerk . . . and [p]hoto lab processor." Id. at 70, 294. In his application on December 26, 2018, for SSDI, Carrara alleged disability due to patellofemoral syndrome, functional bowel syndrome, migraines, major depressive disorder and generalized anxiety. Id. at 55; D. 1 ¶ 7.

## III.     Procedural Background

In his SSDI application, Carrara asserted that he was unable to work as of December 1, 2018. D. 19 at 262. On March 19, 2019, the SSA initially denied Carrara's application. Id. at 53. On May 1, 2019, Carrara submitted a "Request for Reconsideration." Id. at 167. On August 21, 2019, the SSA again denied Carrara's application. Id. at 168–70. Carrara filed a timely request for an ALJ hearing, which was held on April 8, 2020. Id. at 171–72, 188–94. In a written decision, dated April 28, 2020, the ALJ found that Carrara was not disabled within the definitions of the Social Security Act and denied his claims. Id. at 50–72. On December 9, 2020, the AC denied a

---

[2] The Administrative Record appears at D. 19.

request to review Carrara's claim, rendering the ALJ's decision the Commissioner's final decision. Id. at 6–9.

## IV.    Discussion

### A.    Legal Standards

#### 1.    Entitlement to SSDI

Entitlement to SSDI turns in part on whether the individual has a "disability," defined in the Social Security context as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than [twelve] months." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A); 20 C.F.R. § 404.1505(a). The impairment must be sufficiently severe, rendering the claimant unable to do their previous work or any other substantial gainful activity which exists in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505(a)–404.1511(a).

SSA regulations require a five-step process when determining whether a claimant has a disability. 20 C.F.R. §§ 404.1520–416.920. The determination of disability may conclude at any step along the process. Id. First, if the applicant is engaged in substantial gainful work activity, then the application is denied. Id. § 416.920(a)(4)(i). Second, if the applicant does not have, or has not had within the relevant time period, a severe medically determinable impairment or combination of impairments, then the application is denied. Id. § 416.920(a)(4)(ii). Third, if the impairment or combination of impairments meets the conditions for one of the "listed" impairments in the Social Security regulations, then the claimant is considered disabled and the application is granted. Id. § 416.920(a)(4)(iii). Fourth, if the applicant's "residual functional capacity" ("RFC") is such that he can still perform past relevant work, then the application is

denied.  Id. § 416.920(a)(4)(iv).  Fifth and finally, if the applicant, given his RFC, education, work experience and age, is unable to do any other work, the claimant is considered disabled and the application is granted.  Id. § 416.920(a)(4)(v).

        *2.*      *Standard of Review*

This Court has the power to affirm, modify or reverse a decision of the Commissioner upon review of the pleadings and record.  42 U.S.C. § 405(g).  Such review, however, is "limited to determining whether the ALJ deployed the proper legal standards and found facts upon the proper quantum of evidence."  Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999) (citing Manso-Pizarro v. Sec'y of Health & Human Servs., 76 F.3d 15, 16 (1st Cir. 1996)).  Issues of credibility and inferences drawn from the facts on record are for the ALJ who resolves conflicts in the evidence.  Lizotte v. Sec'y of Health & Human Servs., 654 F.2d 127, 128 (1st Cir. 1981) (citing Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981)).  The ALJ's findings of fact are conclusive when supported by substantial evidence.  42 U.S.C. § 405(g).  Substantial evidence exists "if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support [the Commissioner's] conclusion."  Rodriguez, 647 F.2d at 222.  The Court, therefore, must affirm the Commissioner's decision if it is supported by substantial evidence "even if the record arguably could justify a different conclusion."  Rodriguez Pagan v. Sec'y of Health & Human Servs., 819 F.2d 1, 3 (1st Cir. 1987); see Am. Textile Mfrs. Inst., Inc. v. Donovan, 452 U.S. 490, 523 (1981).

**B.**    <u>**Before the ALJ**</u>

    *1.*    *Medical History*

        a.    Physical Impairments

When considering Carrara's application, the ALJ examined extensive evidence regarding Carrara's medical history, including treatment records, assessments and diagnoses.  D. 19 at 55–72.  The ALJ determined that Carrara had several severe impairments (patellofemoral syndrome, functional bowel syndrome, migraines, major depressive disorder and generalized anxiety disorder), <u>id.</u> at 55, but concluded that he was not disabled.  <u>Id.</u> at 71.

        i.    <u>Chronic Migraines</u>

Carrara began seeing Dr. Achey, M.D., for his migraines in 2015.  <u>Id.</u> at 444.  Carrara experienced varying degrees of relief from different medications over the years.  <u>Id.</u> at 444–59.  Dr. Achey noted that Carrara had "disabling migraines" for one-to-two days twice a week which caused him to miss work.  <u>Id.</u> at 456.  Dr. Selines, M.D., completed an SSA Diagnostic Evaluation and noted that Carrara had "challenges" with his memory when he had a "bad migraine." <u>Id.</u> at 492.  Carolyn deBeauport, N.P., noted that stress triggered Carrara's migraines and "bending increase[d] [his] pain." <u>Id.</u> at 463.  Carrara took desipramine to control his migraines and his pain would briefly subside in the evenings.  <u>Id.</u> at 507, 512.

Carrara began seeing Dr. Awais, M.D., in November 2017.  <u>Id.</u> at 355.  Dr. Awais noted that Carrara's migraines were progressively worse and caused him "significant disability." <u>Id.</u> at 547.  Carrara's symptoms included dizziness, nausea and memory problems.  <u>Id.</u> at 544-47.  Carrara continued taking Rizatriptan which worked "[fifty percent] of the time." <u>Id.</u> at 545.  In May 2019, Carrara stopped taking his migraine medication because the medication did not help

his symptoms.  Id. at 514.  Carrara tried other treatments for his migraines.  Id.  In June 2019, Dr.

Levin, M.D., noted that Carrara had "debilitating" headaches daily but did not take his medication

as directed.  Id. at 537.  In December 2019, Carrara's migraines continued to impact his daily

functionality to varying degrees.  Id. at 939.

ii.   <u>Obesity</u>

In December 2018, Dr. Levin reported that Carrara was morbidly obese.  Id. at 411.  In

October 2019, Dr. Levin stated that Carrara was actively trying to lose weight through diet and

exercise.  Id. at 569–70.  Carrara had a daily caloric intake of 1200 calories which caused him to

lose seventy-to-eighty pounds within one year.  Id. at 569.  In December 2019, Carrara complained

that although he was "trying to lose weight" his weight loss "went a little too far."  Id. at 1002.  At

this time, Dr. Levin reported that Carrara's weight was "stable."  Id.

iii.   <u>Patellofemoral Syndrome</u>

As a teenager, Carrara had a few surgeries to repair his fractured left knee.  Id. at 480.  On

July 9, 2019, Carrara visited Dr. Worman, M.D.  Id.  Although Carrara suffered no "new injuries

or traumas," he experienced weakness in both knees and felt as though his knees were "going to

buckle" when he went down stairs.  Id.  Carrara experienced pain when he bent his left knee.  Id.

Carrara's right knee was uncomfortable from years of compensating for his left knee.  Id.  Carrara

denied that either knee swelled, locked or caught.  Carrara's left knee was weaker during straight

leg raises compared to his right knee, was more sensitive to front touching and had "mild

quadriceps atrophy."  Id.  Carrara's left knee also had "no gross deformities or abnormalities,"

"[n]o laxity to valgus or varus stressing," "[n]o acute fracture, subluxation or dislocation" and

"intact extensor mechanisms bilaterally."  Id.  Both of Carrara's knees had "mild joint line

tenderness."  Id.  Carrara had good range of motion in his hips and intact sensation in "all nerve

6

distributions." Id.   Imaging showed that Carrara had "[n]o acute fracture, subluxation or dislocation." Id. Dr. Worman noted that Carrara may have a "very mild degenerative change" in his left knee and that Carrara's complaints are related to patellofemoral syndrome or "maltracking." Id.   Dr. Worman suggested physical therapy which Carrara declined because he could not afford the treatment. Id.  Carrara also did "not feel the need for corticosteroid injections." Id.

Carrara had a normal gait during several medical visits. Id. at 358, 429, 465, 552.  Carrara stated his knee pain worsened throughout 2019. Id. at 939.  On December 27, 2019, Dr. Levin noted that Carrara had "normal" motor strength in his lower extremities. Id. at 1004.

### iv.   Fibromyalgia

In April 2019, Carrara denied feeling any "numbness or tingling in his hands[,] fingers [or] face." Id. at 507.   In February 2020, Carrara "fe[lt] [he was] experiencing symptoms of [f]ibromyalgia and [he] made an appointment with his [primary care physician]." Id. at 1021.  In March 2020, Dr. Finn reported that Carrara was "seeking [the] care [of] a neurologist and rheumatologist to see if . . . [f]ibromyalgia may explain some of [his] symptoms." Id. at 1027.

### v.   Functional Bowel Syndrome

Carrara began using the bathroom three-to-four times a day with intermittent urgency after his cholecystectomy in June 2015. Id. at 512.  In February 2019, Carrara's abdominal pain and frequency of diarrhea increased. Id. at 635.  Carrara's bowel movements only occurred "in the morning or early afternoon." Id. at 483.  Carrara did not frequently use imodium even though the medication helped Carrara control his diarrhea. Id.  In April 2019, Dr. Achey noted that Carrara's stomach pain and nausea were "suggestive of irritable bowel syndrome." Id. at 458–59.

In May 2019, Dr. Finn, M.D., noted that Carrara's endoscopy and colonoscopy were "normal." Id. at 514, 530. In June 2019, Carrara's ultrasound exam indicated he had "fatty infiltration of the liver" and a "small right renal cyst," but all other factors of the exam were either normal or unremarkable. Id. at 532. On June 17, 2019, Carrara's abdominal CT scan was "acceptable." Id. at 571. On June 27, 2019, a video capsule study showed "no evidence of inflamed bowel disease." Id. at 483. Dr. Finn suggested that irritable bowel syndrome, cholectica and severe anxiety disorder caused his "various [gastrointestinal] complaints." Id. at 484, 605.

In March 2020, a higher dose of Zoloft controlled Carrara's "functional bowel syndrome" and allowed Carrara to "sometimes . . . skip a day without any diarrhea." Id. at 1027. At this time, Carrara also used Loperamide one-to-two times a day at least three times a week to control his diarrhea. Id.

        b.      Mental Impairments

             i.      <u>Major Depressive Disorder and Generalized Anxiety Disorder</u>

As a teenager, Carrara sought treatment from a therapist for anxiety and depression. Id. at 58, 935. In May 2019, Dr. Selines noted that Carrara's health problems increased his anxiety and depression. Id. at 496–97. In November 2019, Carrara experienced increased anxiety but was not taking medication nor seeing a psychiatrist. Id. at 609. In an anxiety assessment, Carrara reported feeling "nervous, anxious or on edge . . . nearly every day," was "so restless that it [was] hard to sit still . . . more than half the days" and was "afraid as if something awful might happen . . . nearly every day." Id. Carrara's anxiety made it "very difficult" for him to "work, take care of things at home or get along with other people." Id. On this assessment, a score of "[eight] or higher" indicated a "probable [a]nxiety [d]isorder." Id. Carrara scored sixteen. Id. Around this time,

Carrara's "[w]ife and mother share[d] concerns about [his] level of depression and anxiety."  Id.
at 635.

On November 25, 2019, Carrara was admitted to St. Elizabeth's Medical Center.  Id. at
622–33.  Carrara reported that his "intrusive thoughts to hurt himself" worsened over the last year.
Id. at 635.  Carrara was also depressed, irritated, fatigued, lacked interest and concentration, was
helpless and hopeless and had panic attacks and racing thoughts during the last six months.  Id. at
638, 935.  While at St. Elizabeth's Medical Center, Carrara's condition stabilized with adjustments
in medication and resulting in a "decrease in anxiety and freedom from ongoing panic episodes,"
id. at 636, and he was discharged on December 5, 2019.  Id. at 634.

During December 6, 2019 intake at Gosnold, Carrara reported that he had "persistent,
lasting thoughts or impulses to do something over and over that caused considerable distress and
interfered with normal routines, work, social relations," feared "going somewhere new" and
suffered from a "[m]ild[ly] impaired ability to make reasonable decisions."  Id. at 938, 944.  On
January 27, 2020, Emily-Rose Virden, a nurse practitioner, noted that Carrara's sullen affect,
anxiousness and nervousness caused him to "struggle[d] with daily functioning."  Id. at 1011.

Between January and November 2019, Carrara was addressing his anxiety by taking "a
couple hits [of marijuana] every [two] hours for all waking hours."  Id. at 602.  Dr. Berlinsky,
Ph.D., questioned if Carrara's marijuana use factored into his mental health issues.  Id.  In
November 2019, Carrara began taking Ativan and Atarax which helped his anxiety.  Id. at 636.  In
January 2020, Carrara's psychiatrist adjusted his medication and Carrara's symptoms and
functionality improved.  Id. at 638.  In February 2020, Carrara denied having feelings of
helplessness and hopelessness.  Id. at 1022.  Dr. Virden noted that "overall [Carrara indicated that

he] is doing 'ok' . . . [his] mood is 'ok' on most days . . . [and] his anxiety is lower and feels 'more manageable.'"  Id. at 1021.

       2.    *ALJ Hearing*

At the April 8, 2020 hearing, the ALJ heard testimony from Carrara and Amy Vercillo, a vocational expert ("VE").  Id. at 92–136.

       a.    Carrara's Testimony

Carrara testified that the last time he worked was in December 2018, when he was employed as a call center supervisor at a bank.  Id. at 99-100.  Carrara testified that he was unable to work a scheduled job because the severity of his symptoms varied daily.  Id. at 112.  Carrara testified that he suffered from widespread pain, fatigue, anxiety and migraines which sometimes led to disorientation, light sensitivity, sound sensitivity, nausea, dizziness and decreased hand-eye coordination.  Id. at 112–13.  Regarding his migraines, Carrara testified that he sometimes struggled with "staying on track" and "following [a] line of logic."  Id. at 127.  Carrara also testified that when his gastrointestinal issues were "triggered," he used the restroom three times an hour from "the morning [un]til about early afternoon."  Id. at 113.  Although Carrara did not testify that his weight negatively impacted his ability to work, he did testify that his recent significant weight loss concerned him.  Id. at 116–17.  Finally, Carrara testified that a rheumatologist was investigating his joint pain, stiffness and burning pain in his extremities.  Id. at 121.

The ALJ asked Carrara why he was "able to persevere" in "customer relation type jobs, . . . [or] any job."  Id.  Carrara responded that he had to "go to work" despite "being in pain all the time" because he was a "younger person."  Id. at 122.

The ALJ asked Carrara if he could work in a position with minimal interaction with the public and supervisors.  Id. at 120–21.  Carrara responded that if the only issue was his anxiety,

then jobs with limited interaction would "be a good option" for him but his other impairments preclude him from those jobs. Id. at 121.

The ALJ asked Carrara if past employers tolerated his restroom use and absences. Id. at 116. Carrara responded that his supervisors consistently requested he limit his restroom use and absences. Id. Carrara also testified that his final employer could no longer accommodate him missing work several days each week. Id. at 128–29.

> b.   VE's Testimony

The VE characterized Carrara's past work history as a call center customer service employee as a sedentary skilled position. Id. at 130. The VE characterized his work as a retail assistant manager and retail clerk as light skilled work, id. at 130–131, and his work as a photo lab manager and processor as light, semiskilled work. Id. at 131. The ALJ asked the VE to consider a hypothetical individual "who is of the same age, education and work experience" as Carrara, is only able to perform light work, "must have a restroom at the workplace[,] . . . is able to persist at simple tasks[,] . . . can tolerate simple changes in routine . . . [and] can tolerate only occasional interaction with the public, supervisors and coworkers." Id. at 131. The VE explained that an individual with these limitations could not perform any of Carrara's past work but could perform the light unskilled work of a production labeler, small product packer sorter and sorter and bench assembler. Id. at 132. The ALJ then asked the VE whether the same hypothetical individual with additional limitations of (1) requiring two five-minute bathroom breaks each hour in addition to regularly scheduled breaks, (2) being consistently absent twice a month or (3) being consistently "off-task [twenty] [percent] of the workday" could perform the previously identified jobs. Id. at 131–34. The VE responded that in each scenario, the individual would not be able to perform Carrara's past work or any other work in the economy. Id. at 133–35.

### 3. *Findings of the ALJ*

The ALJ followed the five-step analysis.  See 20 C.F.R § 404.1520(a)(4); D. 19 at 55–72.
At step one, the ALJ found that Carrara had not engaged in substantial gainful activity since
December 1, 2018.  D. 19 at 55.  Carrara does not dispute the ALJ's finding at step one.  D. 22.
At step two, the ALJ found that Carrara's "patellofemoral syndrome, functional bowel syndrome,
migraines, major depressive disorder and generalized anxiety disorder" were severe impairments.
Id. at 55.  At step three, the ALJ found that Carrara did "not have an impairment or combination
of impairments that [met] or medically equal[ed] the severity of one of the listed impairments in"
20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526.  Id. at 57–60.  The ALJ found that Carrara "ha[d]
the [RFC] to perform light work as defined in 20 C.F.R. § 404.1567(b) except he must have a
restroom at the workplace."  Id. at 60.  The ALJ stated that Carrara "is able to persist at simple
tasks," and that "[h]e can tolerate simple changes in routine," but that he can "tolerate only
occasional interaction with the general public, supervisors and coworkers, meaning he should
primarily work with things and not people."  Id. at 60.  Carrara disputes the RFC assessment.  D.
22 at 10–14.  At step four, the ALJ found that Carrara was "unable to perform any [of his] past
relevant work."  D. 19 at 70.  At step five, the ALJ considered the VE's testimony, Carrara's "age,
education, work experience, and [RFC]" and found that Carrara could perform jobs "that exist[ed]
in significant numbers in the national economy."  Id. at 70–71.  The ALJ, therefore, concluded that
Carrara was not disabled as defined by the Social Security Act.  Id. at 71-72.

### C. <u>Carrara's Challenges to the ALJ's Findings</u>

Carrara seeks reversal of the ALJ's decision, or, in the alternative, remand to the SSA for
a new ALJ hearing.  D. 22 at 12.  Carrara contends that the ALJ erred in three ways:  (1) by not
considering Carrara's need for additional bathroom breaks due to gastrological impairments; (2)

by failing to find that Carrara's obesity was a severe impairment alone or in combination with his patellofemoral syndrome; and (3) by considering the effect of Carrara's combined impairments. Id. at 7–12.

### 1. The ALJ Properly Considered Carrara's Limitations Due to Gastrological Impairments

Carrara argues that the ALJ erred in not considering the effect of additional bathroom breaks due to gastrological impairments on Carrara's ability to maintain employment. Id. at 7–8. Carrara asserts that had the ALJ properly considered the bathroom breaks he would have accepted the VE's testimony that Carrara is unable to "sustain competitive work." Id.; D. 19 at 134.

Such arguments, however, are more persuasive where an ALJ "never acknowledged the evidence that ran counter to his conclusions" and failed to "analyze, even minimally, the reasons for his resolution of the conflicts." DaSilva-Santos v. Astrue, 596 F. Supp. 2d 181, 189 (D. Mass. 2009). "[F]or a vocational expert's answer to a hypothetical question to be relevant, the inputs into that hypothetical must correspond to conclusions that are supported by the outputs from the medical authorities." Arocho v. Sec'y of Health & Human Servs., 670 F.2d 374, 375 (1st Cir. 1982). The ALJ can discredit the claimant's testimony about the effect of his impairments. See Frustaglia v. Sec'y of Health & Human Servs., 829 F.2d 192, 195 (1st Cir. 1987) (stating that "the ALJ was entitled to discredit the claimant's testimony regarding the limitations posed by his conditions"). The Court must defer to the Commissioner's credibility findings, for "resolution of conflicts in the evidence is for the [Commissioner], not the courts." Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991); see Farren v. Astrue, No. 10-11103-DPW, 2012 WL 463809, at *8 (D. Mass. Feb. 10, 2012) (finding that the ALJ properly considered the claimant's credibility when disregarding the VE's testimony that there is little to no work for someone who takes five bathroom breaks per day).

Here, the ALJ correctly addressed Carrara's functional bowel syndrome within the hypothetical questions he posed to the VE. D. 19 at 131–34.  In the first hypothetical, the ALJ asked the VE to consider an individual who "must have a restroom at the workplace." Id. at 131.  The VE determined that this hypothetical individual could not perform any of Carrara's past work but could perform the work of a production labeler, product packer and sorter and bench assembler.  Id. at 131–32.  The ALJ also asked the VE to consider other hypothetical situations including one in which the claimant required even two bathroom breaks of five minutes each hourly.  Id. at 132–34.  The VE responded that the hypothetical individual could not maintain employment under those circumstances.  Id. at 133–35.

The ALJ then considered Carrara's testimony and medical reports which indicated that Carrara's gastrological problems sometimes caused him to use the bathroom two-to-four times per hour.  Id. at 63-64, 65, 67.  This frequent bathroom use occurred in "the morning till about early afternoon" when Carrara's irritable bowel syndrome was "triggered." Id. at 113.  The ALJ reviewed medical records indicating that Carrara's video capsule study, "endoscopy and colonoscopy . . . were entirely unremarkable." Id. at 57, 65.  Carrara's medical records indicated that Loperamide made Carrara only have only one bowel movement per day and experience constipation.  Id. at 65.  Carrara's anxiety and gastrointestinal treatments further improved his gastrointestinal problems and "allowed [Carrara] to function well." Id. at 70; see Gaudet v. Astrue, No. 11-11894-RGS, 2012 WL 2589342, at *6 (D. Mass. July 5, 2012) (stating that the ALJ "is entitled to piece together the relevant medical facts from the findings and opinions of multiple physicians") (internal quotation marks omitted) (quoting Evangelista v. Sec'y of Health & Hum. Servs., 826 F.2d 136, 144 (1st Cir. 1987)).  Although Carrara alleged that his gastrointestinal issues still required "too many breaks to use the restroom,"  the ALJ concluded that the "medical evidence

does not corroborate the severity of the claimant's allegations," particularly where there was progressive improvement in his bowel symptoms. Id. at 68. Nonetheless, "[a]fter careful consideration of the entire record," D. 19 at 60, the ALJ determined that Carrara's "gastrointestinal symptoms support the requirement that he must be near a bathroom," and therefore, Carrara was limited to working in a place with a restroom. Id. at 69; see Miller ex rel. K.M. v. Astrue, No. 2009-12018-RBC, 2011 WL 2462473, at *11 (D. Mass. June 16, 2011) (stating that the Court should presume the ALJ considered all the evidence) (citation omitted); see also Flammia v. Colvin, No. 15-CV-13537-RGS, 2016 WL 4487899, at *5 (D. Mass. Aug. 8, 2016) (finding that the ALJ did not commit an egregious mistake when determining that the claimant could manage the "physical limitations" of his irritable bowel syndrome if he was in a "low stress-work environment" and close to a bathroom).

The Court finds that because the ALJ properly considered Carrara's gastrointestinal needs and made conclusions supported by substantial evidence, the ALJ did not err in declining to find a further limitation or include a further limitation regarding bathroom breaks in the RFC.

2.     *The ALJ Did Not Err in Failing to Find that Carrara's Obesity was a Severe Impairment Alone or in Combination with his Patellofemoral Syndrome*

Carrara argues that the ALJ erred by not considering his obesity a severe impairment either alone or in combination with his patellofemoral impairment. D. 22 at 10–12. As an initial matter, the ALJ's failure to find Carrara's obesity a severe impairment at Step 2 is not a reversible error because the ALJ found that Carrara had other severe impairments at Step 2. D. 19 at 55; see Kent v. Berryhill, No. 1:15-CV-12167-IT, 2017 WL 1014996, at *4 (D. Mass. Mar. 15, 2017) (finding that the ALJ did not commit an egregious error when he failed "to find a particular impairment severe at [S]tep [2]" and reasoning that "the court need not determine whether the ALJ erred in

concluding that [the claimant's] obesity . . . did not constitute severe medical impairments" when "the ALJ [finds] that [the claimant] had other severe impairments at Step 2") (citation omitted).

Additionally, obesity is only a severe impairment if "alone or in combination with another medically determinable physical or mental impairment(s), it significantly limits an individual's physical or mental ability to do basic work activities." Titles II & XVI: Evaluation of Obesity, SSR 02-1P, 2002 WL 34686281, at *4 (S.S.A. Sept. 12, 2002). Plaintiffs must rely upon medical evidence to prove their obesity is a severe impairment. See Lam v. Colvin, No. 14-14179-NMG, 2016 WL 3919832, at *8 (D. Mass. June 20, 2016) (citing 20 C.F.R. § 404.1512(c)).

Here, the ALJ referenced multiple medical reports that addressed Carrara's obesity. D. 19 at 55–56. The ALJ found that Carrara "never reported that obesity limited him." Id. at 56. The ALJ noted that although doctors discussed Carrara's need to lose weight there was no indication that Carrara's obesity significantly limited his functional capacity. Id. at 55–56. Carrara did not suggest that obesity functionally limited him. See D. 19 at 97–29; see Rosado v. Colvin, No. 13-30201-MGM, 2015 WL 1206178, at *5 (D. Mass. Mar. 16, 2015) (finding that the ALJ does not commit egregious error when both the claimant and their representative fail to identify "obesity as a limiting condition," the ALJ finds that obesity does not "significant[ly] limit[] . . . basic work activities" and the medical record is absent information concerning obesity's effect on the claimant's other "severe impairments or . . . ability to do basic work activities"). Because there is nothing in the medical record or testimony that attributed a specific functional limitation to Carrara's obesity, the ALJ did not err in concluding that this condition was not a severe impairment. See McDonnell v. Astrue, No. 10-40057-FDS, 2011 WL 3475466, at *9 (D. Mass. Aug. 8, 2011) (stating that "to find that plaintiff's obesity further impaired her ability to work," the ALJ must find "specific limitations related to plaintiff's obesity" in the record) (citation

omitted); see also Frustaglia, 829 F.2d at 195 (stating that "the ALJ was entitled to conclude that the claimant's [impairments] are not severe").

Finally, Carrara argues that the ALJ failed to consider how his obesity effected his patellofemoral syndrome and therefore incorrectly determined that Carrara had a light RFC instead of a sedentary RFC. D. 22 at 11–12. The ALJ can make his own determination as to the effect of obesity on other impairments and the claimant's RFC if there is no substantial reference to obesity in the medical reports. See Manso-Pizarro, 76 F.3d at 17 (stating that "where the medical evidence shows relatively little physical impairment, an ALJ permissibly can render a commonsense judgment about functional capacity even without a physician's assessment"); see also Hagigeorges v. Astrue, No. 11-11842-DPW, 2012 WL 5334771, at *13 (D. Mass. Oct. 25, 2012) (stating that because "the Social Security Administration will not make assumptions about the . . . functional effects of obesity combined with other impairments," if there is no evidence of the functional effects of obesity on other impairments then the "ALJ's failure to address a claimant's obesity is a harmless error") (citation omitted). The Court must presume the ALJ considered the whole record. Miller ex rel. K.M., 2011 WL 2462473, at *11 (stating that the "presumption is that the [ALJ] has considered all of the evidence before him") (citation and internal quotation marks omitted).

Here, the ALJ considered Carrara's obesity. D. 19 at 55-56. Although his body mass index was above 30.0 and he considered obese, it decreased from the relevant time period. Id. at 56. The ALJ noted that Carrara did not follow recommendations regarding his weight and did not testify or report that obesity limited him. Id. As to the effect of same on other conditions, including patellofemoral syndrome, the ALJ noted that Carrara used a knee brace or cane "when he [was] in pain" and at other times did not use any assistive device. D. 19 at 62. The ALJ further noted that

while Carrara was "obes[e] per the [Social Security] regulations," his orthopedic doctor reported that he had a "normal gait." Id. at 55–56, 57, 60. The ALJ also noted that Carrara declined physical therapy for his knees, id. at 61, and "did not feel the need for corticosteroid injection[s]." id. at 480; see Rosado, 2015 WL 1206178, at *5 (reasoning that the ALJ did not commit egregious error in determining that the claimant's decision not to "pursue treatment for her knee pain, regardless of its cause, indicated her symptoms were not as severe as alleged"). The ALJ then determined that "the medical record as a whole [did] not support an inability to ambulate effectively." D. 19 at 57.

The ALJ further noted that Carrara "[could] do household chores, like cleaning, laundry, and small repairs." Id. at 59, 61–62, 69; see Teixeira v. Astrue, 755 F. Supp. 2d 340, 347 (D. Mass. 2010) (stating that "[w]hile a claimant's performance of household chores . . . ought not be equated to an ability to participate effectively in the workforce, . . . [it] can be used to support a negative credibility finding") (citing Berrios Lopez v. Sec'y of Health and Human Servs., 951 F.2d 427, 429 (1st Cir.1991)). The ALJ also noted that Carrara "shop[ed] in stores . . . [and] normally walk[ed] about [ten-to-fifteen] minutes or [half a] mile before he need[ed] to rest." D. 19 at 62; see Teixeira, 755 F. Supp. 2d at 347 (stating that performing daily activities with assistance and frequent "breaks does not prevent the hearing officer from using the testimony of [claimant's] daily activities as one factor in assessing credibility") (citation omitted). The ALJ determined that "the record reflects that [Carrara's] weight caused a less than minimal effect on his ability to perform basic work tasks." D. 19 at 56; see Rosado, 2015 WL 1206178, at *5 (finding that the ALJ did not commit an egregious mistake in failing to find obesity a severe limitation because "[d]espite the limited information in the medical record concerning Plaintiff's obesity, the ALJ specifically considered Plaintiff's obesity in light of [the Social Security Regulations for the

Evaluation of Obesity] and found [the obesity] did not result in any significant limitation to Plaintiff's ability to do basic work activities") (citation and internal quotation marks omitted).

The Court concludes that because the ALJ supported his decision with substantial evidence, he did not err in not finding Carrara's obesity to be a severe impairment alone or in combination with Carrara's patellofemoral syndrome.

### 3. The ALJ Did Not Err in Considering the Effect of Carrara's Combined Impairments

Carrara argues that the ALJ erred in not considering the effect of Carrara's combined impairments on his ability to work. D. 22 at 8–10. Carrara further argues that considering his severe and non-severe impairments together would lead to a finding that Carrara would be excessively absent from work. Id.

"SSA regulations and case law mandate that the ALJ consider the combined effect of a claimant's impairments at each step of the sequential analysis." Snow v. Barnhart, No. 05-11878-RGS, 2006 WL 3437400, at *6 (D. Mass. Nov. 29, 2006) (citing 20 C.F.R. § 404.1520(g)). "[T]he [ALJ] shall consider the combined effect of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity" to merit consideration. 42 U.S.C. § 423(d)(2)(B). The ALJ may discuss the claimant's impairments individually. See Snow, 2006 WL 3437400, at *6 (finding no egregious mistake where the ALJ individually discussed all impairments) (citation omitted). "An ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party." N.L.R.B. v. Beverly Enters.-Mass., Inc., 174 F.3d 13, 26 (1st Cir. 1999); see Miller ex rel. K.M., 2011 WL 2462473, at *11 (stating that the ALJ's "failure to mention a particular record does not mean the ALJ "fail[ed] to consider" the record) (citation omitted).

Here, the ALJ prefaced the decision with "[a]fter careful consideration of the entire record, I make the following findings."  D. 19 at 55; see Miller ex rel. K.M., 2011 WL 2462473, at *13 (reasoning that if an ALJ prefaced his credibility decision with "[a]fter considering the evidence of record" and the Court's "review of the record show[ed] that there is, in fact, substantial evidence to support the ALJ's credibility assessment" then there was no egregious error).  Moreover, at step four, the ALJ went through the individual listings for Carrara's impairments and found that he did "not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in [20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526]."  D. 19 at 57.  The ALJ then considered all of Carrara's severe and non-severe physical and mental impairments.  Id. at 57–60.  At step 5, the ALJ's "residual functional capacity assessment [was] supported by the record as a whole, including [Carrara's] testimony and subjectively reported statements, treatment notes and assessments by [Carrara's] providers, and objective examinations."  Id. at 60–70.  On this record, the Court concludes that because the ALJ adequately considered Carrara's combined impairments, the ALJ did not err.

**D.    Amendment of the Administrative Record By the AC Was Not Warranted**

*1.    Standard of Review*

The AC considers new evidence submitted after the ALJ's decision only if (1) the evidence is "new, material, and relates to the period on or before the date of the hearing decision," (2) "there is a reasonable probability that the additional evidence would change the outcome of the decision" and (3) the claimant had "good cause" for not submitting the evidence earlier.  20 C.F.R. § 404.970(a), (b).

2.      *Carrara's Additional Evidence*

Carrara claims that the AC erred by failing to accept additional rheumatology records into the record.  D. 22 at 3–7.  As to these rheumatology records, the AC accepted them, but given that they related to visits after the ALJ's April 28, 2020 decision, the AC concluded that "this additional evidence does not relate to the time period at issue."  D. 19 at 7.    These records indicate that Carrara visited Dr. Kieval several times for "telehealth visit(s)," May 7, 2020, July 2, 2020 and July 30, 2020.  D. 19 at 41–49.  During the May 7, 2020 visit, although Dr. Kieval did not conclude that Carrara had fibromyalgia, he did start Carrara on Gabapentin and scheduled Carrara for a follow up appointment to investigate further.  Id. at 48–49.  After performing a fibromyalgia workup during the July 2, 2020, visit Dr. Kieval noted that Carrara's symptoms were "[p]ossible [f]ibromyalgia but [it was] not entirely clear."  Id. at 43.   At Carrara's July 30, 2020, visit, Dr. Kieval performed an "unremarkable" joint examination and concluded that he thought that Carrara's signs and symptoms and findings were fibromyalgia.  Id. at 46–47.

3.      *Analysis*

a.      Carrara's Additional Evidence Does Not Relate to the Period at Issue

Carrara argues the additional evidence related to the period at issue because he "complained of widespread body pain" and possible fibromyalgia to doctors before the hearing and to the ALJ at the hearing.  D. 22 at 4.  As an initial matter, as the AC concluded, the new rheumatology records, dated between May 7, 2020, and July 30, 2020, relate to the period after the April 28, 2020 ALJ decision.  D. 19 at 41–49.  In Mills v. Apfel, 244 F.3d 1, 5 (1st Cir. 2001), the First Circuit held that courts may review the AC's refusal to review an ALJ's decision based on new evidence where the AC "gives an egregiously mistaken ground for its action."  Here, although the rheumatology records describe some symptoms that Carrara testified to, the records

only pertain to the appointments Carrara had with Dr. Kieval on May 7, 2020, July 2, 2020, and July 30, 2020.  D. 19 at 41–49.  Although the rheumatology records state some of Carrara's medical history, the records do not contain a retrospective analysis of his condition during the relevant period between December 1, 2018, and April 28, 2020.  Id.; see Anderson v. Astrue, 682 F. Supp. 2d 89, 98 (D. Mass. 2010) (concluding that the AC's determination "that the new information was about a later time . . . was entirely reasonable and . . . not reviewable by [the] court" because although the additional medical records referenced "events that occurred [before the ALJ's decision] . . . and would have been relevant to the ALJ's disability determination . . . the reports were not purported to be retrospective in nature") (internal quotation marks omitted).  In the first medical note, ten days after the ALJ's decision, Dr. Kieval reviewed Carrara's laboratory studies from April 29, 2020, and noted that Carrara was "doing about the same."  D. 19 at 48.  The medical report also contained a section titled "Review of Systems" where Dr. Kieval noted Carrara's joint pain, tingling and numbness in his extremities.  Id. at 49.  Dr. Kieval's reports appear to recite Carrara's past medical history for the purpose of assessing Carrara's current abilities via telemedicine visits, but  do not provide a "retrospective analysis" of Carrara's condition between December 1, 2018 and April 28, 2020.  On this record, the AC's determination that the records did not relate to the period at issue was "entirely reasonable."  See Anderson, 682 F. Supp. at 98.  The AC, therefore, did not "give[] an egregiously mistaken ground for this action."  Mills, 244 F.3d at 5.

> b.    There is No Reasonable Probability That Carrara's Additional Evidence Would Change the Outcome of the ALJ's Decision

Carrara further argues that the rheumatology records would have required the ALJ to credit Carrara's subjective statements of the intensity of his pain in his joints and extremities.  D. 22 at 3–7. Even assuming *arguendo* that all the rheumatology records Carrara proffered relate to the

relevant period at issue, Carrara failed to show that there is a reasonable probability that any of the records would change the outcome of the ALJ's decision.

First, although the ALJ did not have these rheumatology records to consider, he did consider fibromyalgia in his decision.  D. 19 at 57.  The ALJ noted Carrara's belief that he might have this condition and that he had an appointment to address same.  Id.  The ALJ considered the condition, but noted that there was no reference to such condition in the record otherwise and "there was no evidence to establish that fibromyalgia was a medically determinable impairment." Id.  Even if the ALJ had the rheumatology records later provided to the AC for his consideration, they did not provide further information about the effect of such condition on his functioning.  That is, even when Dr. Kieval's reaches his conclusion on July 30, 2020 that Carrara has fibromyalgia, he does not indicate how, if at all, this condition impairs Carrara's functioning.  D. 19 at 47.

The ALJ considered what, if any effect, Carrara's severe (and non-severe) impairments had on his functioning.  The ALJ noted that he was required to "consider other evidence in the record to determine if [Carrara's extremity and joint pain] limit[ed] [his] ability to do work-related activities."  D.19 at 60; see Brown v. Colvin, 111 F. Supp. 3d 89, 99 (D. Mass. 2015) (stating that the "ALJ must consider evidence in addition to medical tests") (citing Nguyen, 172 F.3d at 34). The ALJ, however, can still reject subjective statements of functional limitations and pain if the statements "are unsupported by the medical evidence, treatment history, and activities of daily living."  Rooney v. Astrue, No. 09-30163-MAP, 2010 WL 4027732, at *7 (D. Mass. Sept. 2, 2010) (citations omitted).

An ALJ must consider the following factors enumerated in Avery v. Sec'y of Health & Human Servs., 797 F.2d 19, 28–29 (1st Cir. 1986), when making a credibility determination: "1. [t]he nature, location, onset, duration, frequency, radiation, and intensity of any pain; 2.

[p]recipitating and aggravating factors (e.g., movement, activity, environmental conditions); 3. [t]ype, dosage, effectiveness, and adverse side-effects of any pain medication; 4. [t]reatment, other than medication, for relief of pain; 5. [f]unctional restrictions; and 6. [t]he claimant's daily activities."  See id. at 28 (concluding that "[i]n developing evidence of pain or other symptoms, it is essential to investigate all avenues presented that relate to the subjective complaints").  Although the ALJ must consider all the Avery factors, Bazile v. Apfel, 113 F. Supp. 2d 181, 188 (D. Mass. 2000), the ALJ is not required to expressly discuss every Avery factor in his decision.  Lill v. Astrue, 812 F. Supp. 2d 95, 103 (D. Mass. 2011) (citing Gordils v. Sec'y of Health & Human Servs., 921 F.2d 327, 330 (1st Cir. 1990)).  "[A]n ALJ complies with Avery if he explores the factors at the administrative hearing."  King v. Comm'r of Soc. Sec., No. 11-11709-RBC, 2013 WL 1331209, at *8 (D. Mass. Mar. 28, 2013) (emphasis in original) (citation and internal quotation marks omitted); see Patilla v. Shalala, No. 93-2288, 1994 WL 140416, at *2 (1st Cir. Apr. 15, 1994) (upholding a district court's finding that a hearing officer complied with Avery through questioning during the hearing and substantial evidentiary support of his credibility determination).  The Court must give deference to the ALJ's credibility finding.  See Amaral v. Comm'r of Soc. Sec., 797 F. Supp. 2d 154, 162 (D. Mass. 2010) (stating that "[w]here a hearing officer observes and evaluates a claimant, and makes specific findings, his credibility finding is entitled to deference") (citing Frustaglia, 829 F.2d at 195).

Here, although the ALJ did not expressly address all the Avery factors in his decision including as to symptoms of fibromyalgia, the record reflects that the ALJ considered each Avery factor in making his credibility determination, D. 19 at 60–70, as reflected in his inquiry at the administrative hearing and in his opinion.  He provided a detailed analysis of Carrara's symptoms and the intensity, persistence and limiting effect of same.  Id. at 67-70.  The ALJ considered,

among other things, that Carrara's symptoms "var[ied] in severity from day to day," id. at 60, Carrara's testimony that his joint pain "impede[s] [him] physically from performing" work duties, id. at 121, and that the intensity of his pain caused dizziness, disorientation, nausea and fatigue depending on the severity. Id. at 60–62, 112.  The ALJ also noted that Carrara "agreed to physical therapy" and was "investigating" the pain with a rheumatologist. Id. at 64, 121.  The recording reflects that the ALJ heard Carrara testified to being unable to physically lift things, bend or perform fine motor skills with his hands, id. at 110–28, but that he was able to do household chores, like cleaning, laundry, small repairs, shopping in stores, bowling and walking about ten-to-fifteen minutes or half a mile before needing to rest for ten minutes.  Id. at 58, 59, 61, 62.  After reviewing all the evidence available to him, the ALJ noted that Carrara's statements were "not entirely consistent with the medical evidence and other evidence in the record" because the evidence "reflects less severe limitations." Id. at 67.

Even if the new evidence of fibromyalgia provided a basis for contending that Carrara's statements were consistent "with the objective findings," the ALJ would still not be required to find Carrara's statements about any burning and electric pain credible as to the scope of his limitations, see Avery, 797 F.2d at 21 (reasoning that it is still for an ALJ to determine the credibility of statements made by the claimant or their physician even if the statements are consistent with objective findings), and, as noted above, the new rheumatology records provided no further basis for limitation of Carrara's functioning during the relevant time period. Accordingly, the Court concludes that because Carrara failed to show that there is a reasonable probability that the new evidence would have changed the outcome of the case before the ALJ, the AC's failure to amend the administrative record is not an egregious mistake.

### E.      Denial of Review by the Appeals Council

The decision of the AC to deny a request for review of an ALJ's decision is generally not reviewable as the "reversible error by an ALJ can be remedied by the Court regardless of what the [AC's] did or did not do." Marmol v. Astrue, No. 07-297S, 2008 WL 2831256, at *9 (D.R.I. July 22, 2008).  The First Circuit, however, has held that review of the AC's decision is acceptable in cases "where new evidence is tendered after the ALJ decision." Mills, 244 F.3d at 5.  Accordingly, where new evidence has been submitted to the AC after the ALJ's decision "an [AC's] refusal to review the ALJ may be reviewable where it gives an egregiously mistaken ground for this action." Id.  This "egregious error standard is far more deferential to the [AC] than the supported by substantial evidence in the record standard." See Cano v. Saul, No. 1:19-CV-11563-ADB, 2020 WL 1877876, at *9 (D. Mass. Apr. 15, 2020) (citation and internal quotation marks omitted).

Carrara argues that the AC erred in not reviewing the ALJ's decision.  D. 22 at 3–7.  The AC "found no reason under [their] rules to review the [ALJ]'s decision [and] [t]herefore, . . . denied [Carrara's] request for review."  D. 19 at 6.  The First Circuit has noted that the AC "need not and often does not give reasons" for its decision to deny review.  Mills, 244 F.3d at 5 (noting that failure of the AC to explain how it evaluated new evidence presented to it does not automatically require remand) (citation omitted).  Here, as discussed further above, the AC explained that the additional evidence provided by Carrara either would not have changed the outcome of the ALJ's or, as to the rheumatology records and other records, did not relate to the time period at issue.  D. 19 at 7.  Given this articulation of a basis for the denial of review and, for the reasons stated above, given that the new evidence would not have changed the outcome of the ALJ's decision and substantial evidence supported that decision, the AC did not err in denying review of the ALJ's decision.

**V.      Conclusion**

Based on the foregoing reasons, Carrara's motion to reverse, D. 22,  is DENIED and the

Commissioner's motion to affirm, D. 27, is ALLOWED.

**So Ordered.**

/s/ Denise J. Casper
United States District Judge